

Tagged Opinion

**ORDERED in the Southern District of Florida on November 15, 2007.**

**Paul G. Hyman, Chief Judge**
**United States Bankruptcy Court**

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:                                    CASE NO.:06-12939-BKC-PGH

FREDERICK LETO,                           Chapter 7

    Debtor.
_____/

CINDY CUTRO,                              ADV. NO.:06-1958-BKC-PGH-A

    Plaintiff,

v.

FREDERICK LETO,

    Defendant.

_____/


<u>**MEMORANDUM ORDER SUSTAINING PLAINTIFF, CINDY CUTRO'S, OBJECTION
TO DISCHARGE PURSUANT TO 11 U.S.C. § 727**</u>

    **THIS MATTER** came before the Court on August 1-3, 2007 and

August 23, 2007 upon Plaintiff, Cindy Cutro's (the "Plaintiff")

*Complaint to Determine Debts Nondischargeable Pursuant to 11 U.S.C. §§ 523 and 727* (the "Complaint"). Frederick F. Leto (the "Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy Code on June 29, 2006 (the "Petition Date"). The Plaintiff, a judgment creditor of the Debtor, objects to the Debtor receiving a discharge under 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(5) and objects to discharge of her judgment debt pursuant to § 523(a)(2). The Court having heard the testimony of witnesses, having considered the documentary evidence, the candor and demeanor of the witnesses, and having been otherwise fully advised in the premises, hereby sets forth its findings of fact and conclusions of law.

<u>**FINDINGS OF FACT**</u>

***The State Court Action***

Molo-Cure Research, Inc. ("Molo-Cure"), a Florida for-profit corporation formed in 2001, was principally engaged in the business of retail sales of nutritional supplements. Its principal product was a supplement sold under the trade name Molo-Cure.  The Debtor and the Plaintiff were each fifty-percent holders of the stock of Molo-Cure and the Debtor served as Chief Executive Officer.

On January 7, 2005, the Plaintiff filed a complaint in the Seventeenth Judicial Circuit in Broward County, Florida seeking to inspect the corporate records of Molo-Cure (the "State Court Action"). A few days later on January 10, 2005, the Debtor informed

2

the Plaintiff that her "honorary position as vice-president" had
been rescinded. On January 28, 2005, the Plaintiff amended the
complaint in the State Court Action adding causes of action against
the Debtor for breach of fiduciary duty, conversion, and breach of
contract. The Plaintiff also filed an Emergency Motion for
Temporary Injunction seeking the freezing of Molo-Cure's assets and
placing restrictions on the transfer of Molo-Cure's property and
the operation of its business. On February 18, 2005, the Plaintiff,
the Debtor, and Molo-Cure entered into a *Stipulation and Order on
Record Inspection and Discovery* which prohibited the parties, their
employees and agents from removing, altering, or destroying the
records of Molo-Cure.

As of August 8, 2005, the Debtor was the sole shareholder of
Molo-Cure.[1] On or about September 5, 2005, after returning from
out-of-town, the Debtor was notified that all employees of Molo-
Cure had resigned at the direction of Leland Grant and had begun
working for a new company, Digestinol. In October, 2005,
Digestinol's website became operational and claimed that: (1)
Digestinol used the same Molo-Cure formula, (2) the formula had
been assigned to Digestinol by the Chief Executive Officer of Molo-
Cure, and (3) Molo-Cure's staff had transferred their services to

---

[1] While the record is unclear as to how the Debtor became
the sole shareholder, this fact is taken from the Stipulated
Facts in the Pretrial Order entered in this case on August 1,
2007.

Digestinol.

On September 16, 2005, the Debtor, the Plaintiff, and Molo-Cure announced on the record in the State Court Action that they had reached a settlement agreement (the "Settlement Agreement"). However, the Debtor later failed to make payments under the Settlement Agreement. On November 17, 2005, the state court granted the Plaintiff's Amended Motion to Enforce Settlement Agreement. On December 8, 2005, a final judgment was entered in favor of the Plaintiff and against the Debtor in the State Court Action in the amount of $7,000,000.00 (the "State Court Judgment").

**The Debtor's Prepetition Property Transfers**

Prior to June, 2004 the Debtor, with the counsel and assistance of Leland Grant ("Grant"), who is not an attorney, formed several common law trusts, including the South Florida Property Guardian Holding Trust (the "Guardian Trust"). Grant served as the "trust protector" of the Guardian Trust and the trustees were John Maragoudkais a/k/a John Markis, Rich Stack, and John Mayrow, all friends of the Debtor. John Markis, as the Debtor's friend, also lent the Debtor money to pay his attorney's fees and helped with his living expenses. At trial, Grant stated that the Debtor was a "benefactor" of the trusts who secured benefits for the beneficiaries that the Debtor would later name, although the evidence does not establish the identities of any other beneficiaries. The Debtor testified that other than a short

4

period of time at the initial formation stage, he did not possess the trust documents and was unable to obtain copies from Grant despite the Debtor's repeated requests. When questioned about the trust documents, Grant testified that, while the Debtor may have had drafts of the trust agreements, Grant provided copies of the trust agreements only to the board of trustees of each trust, and not to the Debtor. The trust agreements were not introduced at trial.

At trial, the Debtor testified that the trusts were set up for estate planning purposes to protect the Debtor and his property from "slip and fall suits" and to protect his property from probate. The Debtor further testified that Grant advised him that by making these transfers into the trust he could "own nothing and control everything," which the Debtor understood to mean that he could relinquish ownership but continue to use and live on the property. In fact, the Debtor's use of, and access to, the property remained unchanged after each of the transfers. The Guardian Trust was established and set up by Grant for the purpose of holding all of the Debtor's real property. Neither the Debtor nor Grant was able to testify with certainty as to when the trusts were formed, though the Debtor recalled that it was sometime in 2003, when he began acquiring significant real property assets.

From June, 2004 to January, 2005, the Debtor executed a series of quitclaim deeds purporting to transfer all of his interests in

real property to the Guardian Trust.  However, some of these deeds were not properly witnessed or were not properly notarized as required under Florida law. As discussed below, in November and December, 2005, the Debtor executed corrective quitclaim deeds for three of the four parcels of real property.

1.    *The Marina Mile Property*

On January 24, 2005, the Debtor acquired an interest in real property identified as the Marina Mile Property, more precisely described as

> Commercial Condominium Unit No. 101 and 102, of MARINA MILE BUSINESS PARK COMMERCIAL CONDOMINIUM I, a Commercial Condominium, according to the Declaration of Condominium thereof, recorded in Official Records Book 38485, at page 829, of the Public Records of Broward County, Florida, together with an undivided share in the common elements appurtenant thereto

(the "Marina Mile Property").

The Debtor attempted to transfer his entire interest in the Marina Mile Property by executing a quitclaim deed to the Guardian Trust on January 25, 2005 and recording the deed on May 4, 2005. However, the deed purporting to convey the property was not properly notarized as required under Florida law. Therefore, on November 30, 2005, the Debtor executed and recorded a corrective quitclaim deed "to correct the legal description and notarial seal." The Debtor received no consideration for this transfer.

2.    *The L'Hermitage Property*

On May 15, 2003, the Debtor acquired an interest in real

6

property identified as the L'Hermitage Property, more precisely described as

> Unit A2310 L'HERMITAGE I, a Condominium according to the Declaration of Condominium thereof, as recorded in Official Records Book 27115, Page 916 of the Public Records of Broward County, Florida

(the "L'Hermitage Property).

The Debtor attempted to transfer his interest in the L'Hermitage Property by executing a quitclaim deed to the Guardian Trust on June 30, 2004 and recording the deed on January 25, 2005. However, the deed was not properly witnessed as required under Florida law. Therefore, on December 13, 2005, the Debtor executed and recorded a corrective quitclaim deed "to correct the witness requirement." The Debtor received no consideration for this transfer.

3.    *The Thatch Palm Property*

On August 30, 2004, the Debtor acquired an interest in real property identified as the Thatch Palm Property, more precisely described as

> Lot 30, Block 15, ROYAL PALM YACHT & COUNTRY CLUB SUBDIVISION, according to the Plat thereof, as recorded in Plat Book 26, Page 57, of the Public Record of Palm Beach County, Florida.

(The "Thatch Palm Property").

The Debtor attempted to transfer his interest in the Thatch Palm Property by executing a quitclaim deed to the Guardian Trust on September 30, 2004 and recording the deed on August 10, 2005. However, the deed was not properly witnessed as required under Florida law. Therefore, the Debtor executed and recorded a

7

corrective quitclaim deed on December 15, 2005 "to correct the witness requirement." The Debtor received no consideration for this transfer.

4.   *The Royal Palm Property*

On November 17, 2004, the Debtor acquired an interest in real property identified as the Royal Palm Property, more precisely described as

> Lot 12, Block 15, ROYAL PALM YACHT & COUNTRY CLUB SUBDIVISION, according to the Plat thereof, as recorded in Plat Book 26, Page 57, of the Public Records of Palm Beach County, Florida

(the "Royal Palm Property").

On October 4, 2004, the Debtor transferred his interest in the Royal Palm Property by executing a quitclaim deed conveying the property to the Guardian Trust and recording the deed on November 30, 2005. Unlike the original quitclaim deeds for the other properties at issue here, the quitclaim deed conveying the Royal Palm Property contained no witness or notary defects. However, as with each of the other transfers, the Debtor received no consideration for this transfer.

**The Instant Action**

The Debtor filed a petition under Chapter 7 of the Bankruptcy Code on June 29, 2006. The Debtor's bankruptcy schedules listed $820.00 in assets and initially disclosed that he owned no real property. On August 9, 2006, the Debtor filed an Amended Schedule A listing the L'Hermitage property as the only real property in

8

which he had an interest. The Debtor claimed it as his "homestead held in trust." In the Debtor's Statement of Financial Affairs filed August 23, 2006, the Debtor disclosed that he had transferred the Marina Mile Property to the Guardian Trust within two years prior to the Petition Date. However, the Debtor did not disclose the status or disposition of either the Thatch Palm Property or the Royal Palm Property in his Schedules or Statement of Financial Affairs.

The Plaintiff filed the instant action on September 29, 2006 objecting to the Debtor receiving a discharge of his debts.

## CONCLUSIONS OF LAW

The Court has jurisdiction over this matter under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (I), and (J).

At trial the Court ruled in favor of the Debtor for the Plaintiff's claim under § 523(a)(2). The remaining issue is whether the Debtor should receive a discharge under § 727. For the reasons stated below, the Court overrules the Plaintiff's objection to discharge under § 727(a)(5) but sustains the objection under § 727(a)(2)(A) and denies the Debtor's discharge.

### I.   *Objection to Discharge Under Section 727(a)(2)(A)*

The Plaintiff argues that the Court should deny the Debtor a discharge under 11 U.S.C. § 727(a)(2)(A) for alleged transfers of

9

business assets and other personal property, and for multiple transfers of real property to common law trusts. Section 727(a)(2)(A) provides that:

> The Court shall grant the debtor a discharge, unless –
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed --
>
> (A) property of the debtor, within one year before the date of the filing of the petition;

11 U.S.C. § 727(a)(2)(A).

The Plaintiff bears the initial burden of proof by a preponderance of the evidence. Fed. R. Bankr. P. 4005. *See also Grogan v. Garner*, 498 U.S. 279 (1991); *Shappel's Inc. v. Perry (In re Perry)*, 252 B.R. 541 (M.D. Fla. 2000). To establish a claim under § 727(a)(2), the Plaintiff must prove that: (1) a transfer occurred, (2) the transfer was of the Debtor's property, (3) the transfer was within one year of the Petition Date, and (4) the transfer was done with the intent to hinder, delay, or defraud a creditor or the trustee. *See In re Gauthier*, 2007 WL 1580100, *3 (S.D. Fla 2007); *Perry*, 252 B.R. at 547. Under § 727(a)(2)(A), a transfer of real property occurs when the deed is recorded in the clerk's office and becomes effective as to third parties. *See Ingersoll v. Kriseman (In re Ingersoll)*, 124 B.R. 116, 121 (Bankr. M.D. Fla. 1991).

The Court finds that the Debtor transferred or concealed

10

multiple parcels of real property within one year prior to the Petition Date, including the Marina Mile Property, the L'Hermitage Property, the Thatch Palm Property, and the Royal Palm Property with the intent to hinder, delay, or defraud creditors. The evidence presented at trial establishes that the Debtor acquired the Marina Mile Property, the L'Hermitage Property, the Thatch Palm Property, and the Royal Palm Property between May, 2003 and January, 2005, and that each was property of the Debtor at that time. The Debtor subsequently executed quitclaim deeds for each of the properties at issue between January, 2002 and October, 2004 purporting to transfer each of the real properties to the Guardian Trust. However, because the deed attempting to convey the Marina Mile Property was not properly notarized, and the deeds attempting to convey the L'Hermitage Property and the Thatch Palm Property did not contain the signatures of two subscribing witnesses, the deeds were ineffective to transfer title under Florida law. *See* Fla. Stat. § 689.01. *See also Am. Gen. Home Equity, Inc. v. Countrywide Home Loans, Inc.*, 769 So. 2d 508, 509 (Fla. Dist. Ct. App. 2000)("[A] deed which lacks two subscribing witnesses is insufficient to convey title"). Therefore, because the original deeds were ineffective, these properties required a corrective quitclaim deed in order to convey title. Thus, the date of transfer is the date on which the Debtor recorded the corrective quitclaim deeds. All of the quitclaim deeds were recorded within one year of

the Petition Date.

The Debtor relies on *Herron v. Singh (In re Ramsurat)*, 361 B.R. 246, 256 (Bankr. M.D. Fla. 2006), for the proposition that a corrective deed does not convey title, but rather it reforms the original instrument and relates back to the date of the original instrument. However, the original deed at issue in *Ramsurat* was properly executed and a corrective deed was executed only to "correct the legal description" to accurately reflect the party's agreement. The Court in *Ramsurat* reasoned that "[a] reformation relates back to the time the instrument was originally executed and simply corrects the document's language to read as it should have read all along." *Id.* In this case, the deeds purporting to transfer the Marina Mile Property, the L'Hermitage Property, and the Thatch Palm Property were procedurally defective and the corrective deeds did more than simply correct the original deeds' language. The deeds having not been properly executed were insufficient and ineffective to convey title under Florida law. The corrective quitclaim deeds were required to convey title in the Marina Mile Property, the L'Hermitage Property, and the Thatch Palm Property.

At the conclusion of the trial, the Debtor argued that the Guardian Trust was not a valid trust, and therefore the transfers into the Guardian Trust must also be invalid. The Debtor's argument is barred by the equitable doctrine of judicial estoppel. Judicial

estoppel "is applied to the calculated assertion of divergent sworn positions . . . [and] is designed to prevent parties from making a mockery of justice by inconsistent pleadings." *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002). Courts consider two factors when applying judicial estoppel: (1) the inconsistent positions must have been made under oath in a prior proceeding, and (2) the inconsistencies must be shown to have been calculated to make a mockery of the judicial system. *Id*. However, these two factors are not exhaustive and courts will consider all of the circumstances of a particular case when applying judicial estoppel. *Id*.

Under the circumstances in this case, the Court finds that the Debtor is barred from arguing that the Guardian Trust was not a valid trust and that the transfers therefore failed. The Debtor's Amended Schedule A, filed in the main case on July 28, 2006, does not disclose that the Debtor had a legal or equitable interest in the Marina Mile Property, the Thatch Palm Property, or the Royal Palm Property. However, in order to overcome the pending objection to discharge based on those transfers the Debtor now seeks a finding from this Court that he was the true owner of these properties on the Petition Date. If the Debtor believes the Guardian Trust was not a valid trust and that the transfers were also invalid, then the Debtor's interests in each of the properties became property of the estate as of the Petition Date and should

13

have been disclosed on the Debtor's schedules.  However, only the L'Hermitage Property appears on the Debtor's Amended Schedule A.[2] The Debtor cannot claim at the time of the petition that he held no interest in the properties because they were transferred to the Guardian Trust, but now, when it would be to his benefit, claim that the transfers were invalid in order to defeat the pending objection to discharge.  The Debtor's present position is inconsistent with his schedules, which were signed under oath.  The Debtor either misled the Court when he failed to disclose real properties in which he had an interest, or he transferred those properties to the Guardian Trust in November and December of 2005, within one year of the Petition Date.  To permit the Debtor to advance this new position regarding the invalidity of the Guardian Trust, of which he was the primary beneficiary, would allow the Debtor to benefit by virtue of incomplete disclosure at the outset of the case and make a mockery of this proceeding.  As a result, the Court concludes that the Debtor cannot assert that the transfers to the Guardian Trust in November and December of 2005 were invalid. Therefore, the first three elements of a claim under § 727(a)(2)(A) have been established.

---

[2] The Debtor claimed the L'Hermitage Property as his homestead held in trust. Assuming the property was in fact the Debtor's homestead, he was correct to claim it as such on his schedules even though it was held in trust as of the Petition Date. *See In re Alexander*, 346 B.R. 546 (Bankr. M.D. Fla. 2006)(finding that a debtor's real property held in trust is entitled to Florida's homestead exemption).

14

The remaining § 727(a)(2)(A) element is the Debtor's intent at the time of the transfers. Because a debtor is unlikely to testify that he possessed the requisite fraudulent intent, the Court may consider circumstantial evidence or infer fraudulent intent from the Debtor's actions. *In re Lordy*, 214 B.R. 650, 664 (Bankr. S.D. Fla. 1997). Courts generally consider "badges of fraud" when deciding whether a debtor had the requisite intent to hinder, delay, or defraud creditors under § 727(a)(2). *Dzikowski v. Gauthier (In re Gauthier)*, 2007 WL 1580100, *3-4 (Bankr. S.D. Fla. May 30, 2007); *Dzikowski v. Chaunsey (In re Chaunsey)*, 308 B.R. 97, 105 (S.D. Fla. 2004), *aff'd in part, rev'd in part sub nom Chauncey v. Dzikowski (In re Chauncey)* 454 F.3d 1292 (11th Cir. 2006). Even a single badge of fraud may justify a finding of actual fraudulent intent while several badges of fraud may constitute conclusive evidence of fraud. *See Ingersoll*, 124 B.R. at 122. The badges of fraud to be considered by the Court include: (1) lack of adequate consideration for the property transferred; (2) a family or close relationship between the parties; (3) retention of possession for use and benefit; (4) financial condition of the transferor before and after the transfer, i.e. the debtor became insolvent as a result of the transfers; (5) cumulative effect of the transactions and course of conduct after onset of financial difficulties or threat of suit; and (6) general chronology and timing of events. *See Chaunsey*, 308 B.R. at 105; *Perry*, 252 B.R. at 547. Moreover,

15

"when there is a gratuitous transfer of valuable property a presumption is raised that the transfer must have been accompanied by the actual fraudulent intent required to bar discharge." *Ingersoll*, 124 B.R. at 121 (citing *In re Ford*, 53 B.R. 444, 449 (Bankr. W.D. Va. 1984)). Fraudulent intent may also be inferred from a debtor's attempts to effectuate a transfer of real property after suit has been filed against the debtor. *See Ingersoll*, 124 B.R. at 122.

Several badges of fraud are present in this case. First, the Debtor received no consideration in exchange for the properties transferred to the Guardian Trust. Also, the Debtor had a close relationship with the trustee of the Guardian Trust, John Markis, who had previously paid attorney's fees on the Debtor's behalf and who had loaned money to the Debtor for living expenses. In addition, the Debtor was the primary beneficiary of the Guardian Trust. Leland Grant, who assisted in setting up the various trusts, including the Guardian Trust, explained to the Debtor that they would allow the Debtor to "own nothing, control everything." After the Debtor transferred the properties to the Guardian Trust, he continued to enjoy the use and benefit of the property as though they were his own. In addition, the Debtor transferred his most significant assets, his real estate holdings, to the Guardian Trust at a time when he was unable to make payments to the Plaintiff under the Settlement Agreement. While the Debtor testified that he

16

had begun considering estate planning options prior to the State Court Action, he presented no evidence to establish the date of formation of the trusts. Even if the estate planning options were put into motion earlier, the Debtor did not record the deeds purporting to transfer his interests in several valuable parcels of real property until after the Plaintiff filed the complaint in the State Court Action. In November, 2005, after the State Court granted the Plaintiff's Motion to Enforce Settlement Agreement but before the State Court entered Final Judgment, the Debtor executed and recorded corrective quitclaim deeds successfully divesting himself of any interest in the properties. The timing of the initial attempted transfers and subsequent corrective deeds taken together with the lack of consideration for each transfer, the relationship between the Debtor and the trustee of the Guardian Trust, the Debtor's financial situation before and after the transfers, and the fact that the Debtor retained the benefit and use of the properties conclusively establishes that the Debtor had the requisite intent under § 727(a)(2)(A) to hinder, delay, or defraud creditors.

The Court finds that the Debtor transferred all of his interest in the Marina Mile Property, the L'Hermitage Property, the Thatch Palm Property, and the Royal Palm Property within one year before the Petition Date. The Court also finds, based on the circumstances surrounding the transfer and the presence of multiple

badges of fraud discussed above, that the transfers were made with the intent to hinder, delay, or defraud creditors. Therefore, the Plaintiff's objection to discharge under § 727(a)(2)(A) is sustained and the Debtor's discharge is denied.

Having determined that the Debtor should be denied a discharge under § 727(a)(2)(A) based upon the transfers of real property to the Guardian Trust, the Court does not make any findings concerning the alleged transfers of the assets of Molo-Cure.[3]

## II. Section 727(a)(5)

The Plaintiff also argues that the Debtor should be denied a discharge under § 727(a)(5) for failure to satisfactorily explain a loss of assets. Section 727(a)(5) provides that:

The court shall grant the debtor a discharge, unless --

(5)    the debtor has failed to explain satisfactorily, before determination of denial of discharge, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727(a)(5).

The Plaintiff carries the initial burden to show that the

---

[3] The Chapter 7 trustee filed a related adversary against Leland Grant, among others, alleging civil conspiracy to fraudulently transfer the assets of Molo-Cure Research, Inc. *Furr v. Digestinol Research Foundation, Inc., et al.*, Case No. 06-2032-PGH-A. The Court makes no findings as to these alleged transfers of Molo-Cure's assets so as not to prejudice the parties in the related adversary proceeding.

Moreover, on November 6, 2007, the Debtor filed a *Motion to Reopen*, seeking to reopen the record to introduce into evidence new developments concerning the alleged fraudulent transfer of Molo-Cure assets. Because the Court is not ruling on that issue, the Debtor's Motion to Reopen will be denied as moot by Order entered contemporaneously with this Memorandum Opinion.

Debtor formerly owned substantial, identifiable assets that are now unavailable to distribute to creditors. *In re Chauncey*, 308 B.R. 97, 103 (Bankr. S.D. Fla. 2004). Once the Plaintiff has met its burden, the burden shifts to the Debtor to establish a satisfactory explanation for the asset reduction. *Id*. "To be satisfactory, 'an explanation' must convince the judge. Vague and indefinite explanations of losses that are based upon estimates uncorroborated by documentation are unsatisfactory." *In re Chalik*, 748 F.2d 616, 619 (11th Cir. 1984) (citations omitted).

The subject assets are two vehicles, a 2001 Mustang and a 2004 Jaguar, and the Debtor's reported income of approximately $1,525,879 for 2005. The vehicles had both previously been transferred to the Palm Thatch Asset Management and Holding Trust (the "Palm Thatch Trust"), another common law trust established by the Debtor to hold his personal property. The evidence presented at trial establishes that the Mustang was sold out of the Palm Thatch Trust in 2006 for $12,000 and the proceeds were given to the Debtor's sister who had paid an attorney's bill on the Debtor's behalf. The Jaguar was sold in 2006 for $15,000. From the proceeds of the sale of the Jaguar, $13,500 were paid to John Markis, trustee for the Palm Thatch Trust, who had paid attorney's fees on the Debtor's behalf. The Debtor received the remaining $1,500 of the proceeds which he testified he used to pay for food, electricity and other living expenses. Based upon the Debtor's

explanation at trial, the Court finds that the Debtor has satisfactorily explained the disposition of both the 2001 Mustang and the 2004 Jaguar.

When asked at trial to explain what happened to his income from 2005, the Debtor created a summary based upon his review of bank statements for Pure Nutriceutical Corporation, the corporation through which the Debtor took his distributions from Molo-Cure. Based upon his review of those documents, which were not entered into evidence, the Debtor specifically detailed how he spent his 2005 income. He testified that the income was used to make substantial mortgage payments, payments to American Express, and to pay for business related expenses such as advertising and promotion, printing, shipping, and supplies. While the Debtor did not itemize every individual expense and provide a receipt or other documentation to support each statement or expense, the Court finds that the Debtor's explanations at trial were sufficiently detailed to satisfy his obligation to explain the disposition of his 2005 income. The Debtor's explanations were not so vague and indefinite as to warrant a denial of discharge under § 727(a)(5).

The Plaintiff identified no other assets formerly owned by the Debtor that are now unavailable to distribute to creditors. The Court finds that the Debtor satisfactorily explained the disposition of assets identified by the Plaintiff. Therefore, the Plaintiff's objection to discharge under § 727(a)(5) is overruled.

**CONCLUSION**

For the reasons stated above, the Court finds that the Debtor transferred property within one year of the Petition Date with the intent to hinder, delay, or defraud creditors. Therefore, the Plaintiff's objection to discharge under 11 U.S.C. § 727(a)(2)(A) is sustained. However, the Court also finds that the Debtor satisfactorily explained the disposition of his income from 2005 as well as two vehicles identified by the Plaintiff and therefore the Plaintiff's objection to discharge under 11 U.S.C. § 727(a)(5) is overruled.

**ORDER**

The Court having heard the testimony of witnesses, having considered the documentary evidence, the candor and demeanor of the witnesses, and having been otherwise fully advised in the premises, hereby

**ORDERS AND ADJUDGES** that:

1)    Judgment is awarded in favor of the Plaintiff.

2)    The Debtor's discharge is **DENIED** under 11 U.S.C. § 727(a)(2)(A).

3)    The Plaintiff's objection to discharge under 11 U.S.C. § 727(a)(5) is **OVERRULED**.

4)    Pursuant to Federal Rule of Bankruptcy Procedure 9021, a separate final judgment shall be entered by the Court contemporaneously herewith.

21

###

Copies Furnished To:

Mark A Levy, Esq

Kevin C Gleason, Esq

Susan D. Lasky, Esq

Marc P Barmat, Esq

AUST